# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 14, 2011 Session

## STATE OF TENNESSEE v. CHRISTOPHER EARL WATTS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-D-3224      Cheryl Blackburn, Judge**

---

**No. M2009-02570-CCA-R3-CD - Filed May 3, 2012**

---

A Davidson County Criminal Court Jury convicted the appellant, Christopher Earl Watts, of four counts of aggravated child abuse, two counts of aggravated child neglect, and one count of child neglect. After a sentencing hearing, the appellant received an effective sentence of seventy-five years to be served at one hundred percent. On appeal, the appellant contends that (1) the trial court erred by denying his motion to sever the offenses; (2) the trial court erred by instructing the jury that the appellant's co-defendant was an accomplice; (3) the evidence is insufficient to support the convictions; (4) the trial court erred by failing to merge the appellant's aggravated child neglect convictions; and (5) his effective sentence is excessive. The State concedes that the trial court erred by failing to merge the appellant's aggravated child neglect convictions. We conclude that the trial court erred by failing to grant the appellant's motion to sever but that the error was harmless. We also conclude that the evidence is insufficient to support one of the appellant's convictions for aggravated child abuse, one of his convictions for aggravated child neglect, and his conviction for child neglect. The appellant's remaining convictions and effective seventy-five-year sentence are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part and Reversed in Part.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., J., joined. JERRY L. SMITH is not participating.

Emma Rae Tennent (on appeal), J. Michael Engle (at trial), and Aisha McWeay (at trial), Nashville, Tennessee, for the appellant, Christopher Earl Watts.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

The record reflects that in October 2007, the Davidson County Grand Jury indicted the appellant for the following crimes: count 1, aggravated child abuse; count 2, child neglect; count 3, aggravated child abuse; counts 4 and 5, aggravated child neglect; and counts 6 and 7, aggravated child abuse. According to the indictment, counts 1 and 2 occurred on or about April 16, 2007; counts 3 and 4 occurred on or about June 15, 2007; count 5 occurred between June 13 and 14, 2007; and counts 6 and 7 occurred between May 29 and June 15, 2007. In counts 2 though 7, the appellant was indicted jointly with the victim's mother, Lakeisha Watkins.[1] However, the appellant was tried separately from Watkins.

At the appellant's trial, Janelle Driver, a paramedic with the Nashville Fire Department, testified that about 6:30 p.m. on April 16, 2007, she was dispatched to Watkins' home in response to a 911 call placed by Watkins. When paramedics arrived, Watkins was outside carrying the fifteen-month-old victim. Driver said the victim was breathing and had "no obvious apparent injury." Watkins told Driver that the victim fell about 11:00 a.m., may have hit his head, and was fine all day but began acting sleepy about 6:00 p.m. Watkins also told Driver that she did not call 911 earlier because the victim was acting normal.

Driver testified that the victim appeared "a little bit sleepy." In assessing the victim, Driver asked Watkins about seizures, and Watkins said the victim did not have a history of seizures. Driver noticed the victim had a bruise above the top of his nose that was consistent with a fall or blunt injury. When she lifted the victim's shirt to check his airway and listen to his heart, she noticed small scratches on both sides of his neck. Driver said Watkins told her the scratches were due to the victim's "rough playing." Driver did not see any other injuries on the victim, and paramedics transported him to the Vanderbilt Pediatric Emergency Room (ER). Driver never talked with the appellant.

Bryan Jones, a paramedic with the Nashville Fire Department, testified that on the night of June 15, 2007, paramedics were dispatched to Watkins' home in response to a 911 call about an unconscious child. When they arrived at 10:18 p.m., firemen were carrying the victim to an ambulance and were using a bag mask over the victim's face to ventilate him. The victim was having seizures and was unable to control his airway or breath efficiently. The victim had a pulse, but his heart rate was very low and irregular. Paramedics continued to ventilate the victim with the bag mask and gave him Valium rectally to control the

---

[1]Watkins also was charged in count 8 of the indictment with aggravated child abuse for striking the victim with a belt between May 29, 2007, and June 15, 2007.

seizures. Jones said Watkins "described seizure activity" that occurred about eighteen hours before the 911 call. However, Watkins denied any recent trauma to the victim. Jones said there was no evidence of any food in the victim's airway that would have prohibited the victim from breathing and that Watkins did not say the victim choked on anything. Watkins told Jones that the victim did not have a history of seizures. Jones noticed the victim's pupils were small and were not at a normal level, indicating a neurological injury or a drug overdose. The victim's condition was critical, and paramedics transported him to the hospital. Jones never spoke with the appellant.

On cross-examination, Jones testified that the Valium caused the victim's condition to improve temporarily. However, the victim's seizures returned while en route to the hospital.

Falonda Tolston, a case manager for Child Protective Services, testified that she became involved with the victim's case on April 17, 2007. The victim spent one day in the hospital, and Tolston spoke with his mother and maternal grandparents. Tolston said that as part of the victim's "safety plan," he was to live with his maternal grandmother for thirty days so that Tolston could complete her investigation. On April 18, 2007, Tolston went to Lakeisha Watkins' apartment, but no one was there. About May 22, 2007, Tolston received a telephone call from the victim's maternal grandfather, telling her that Watkins and the appellant had taken the victim home. On May 29, Tolston went to Watkins' apartment and spoke with her. Tolston said that the victim "still had some marks from the [April 16] incident" but that he "seemed fine." The appellant was not present, and Tolston did not see any evidence he was living with Watkins. Tolston said that if she had received information about the appellant's living there, she would have "[p]robably re-enacted the safety placement." Tolston needed to interview the appellant in order to complete her investigation but never spoke with him. In June 2007, she learned the victim was in the hospital again. At that point, the police got involved with the victim's case.

On cross-examination, Tolston acknowledged that nothing legally prevented Watkins from removing the victim from his grandparents' care. Tolston also acknowledged that the appellant's living with Watkins would have been a violation of Watkins' lease agreement, which allowed only family members to live in Watkins' apartment.

On redirect examination, Tolston testified that when she saw the victim in the hospital in April 2007, he had bruises on his face and a few marks on his right eye. She said that when she saw him on May 29, 2007, he still had "old marks from April. . . . They appeared to be scratches and old scars."

Detective Woodrow Ledford of the Metropolitan Nashville Police Department

(MNPD) testified that about 10:00 p.m. on June 15, 2007, he was on patrol and was dispatched to Watkins' apartment. When he arrived at the apartment, the victim was in an ambulance, and Watkins was sitting in the cab of the ambulance. Detective Ledford went inside Watkins' apartment, but no one was there. He went upstairs and noticed a puddle of water on the bathroom floor.

On cross-examination, Detective Ledford testified that he did not see a telephone in the apartment. He acknowledged that he spoke with Watkins and that she told him she fed the victim bologna and bread that night.

John Watkins, Lakeisha Watkins' father, testified that he currently had custody of the three-year-old victim. On April 16, 2007, he and his ex-wife learned the victim was in the hospital and went to see the victim. The victim had a bruise on his forehead, and his eyes were swollen shut. He also had a small knot on the side of his head and a small knot on the back of his head. Mr. Watkins spoke with the appellant at the hospital. The appellant claimed that the victim pulled away from the appellant's hand, ran down a hill, fell, and hit his face. Mr. Watkins had seen the victim run previously, and the victim did not run very well. While the victim was in the hospital, the appellant told some nurses that he was the victim's father. Mr. Watkins told the appellant that he was not the victim's father or stepfather, and the appellant got upset. The appellant claimed he cared for the victim, but Mr. Watkins did not believe him. When doctors discharged the victim from the hospital, he lived with Mr. Watkins for about three weeks. The victim was alert and did not have any seizures during that time. Then the victim went to live with his grandmother for three weeks. At some point, the victim's mother and the appellant took the victim home. Mr. Watkins notified Falonda Tolston.

Mr. Watkins testified that in June 2007, the appellant telephoned Mr. Watkins' ex-wife and told her that the victim was in the hospital. Later, the appellant telephoned her again and asked how the victim was doing. Mr. Watkins said he told the appellant to "come down here and see for yourself." The victim was in the hospital for a couple of weeks, but Mr. Watkins never saw the appellant. After the victim was discharged, the victim went to a hospital in Atlanta for rehabilitation. He was there for one month, and Mr. Watkins stayed with him. The victim was blind and had to learn to walk again and use his arms and hands. After he left the Atlanta hospital, his eyesight returned. Mr. Watkins said that since the victim had regained his eyesight, his recovery "has been like leaps and bounds." The victim still had limited use of his left leg and arm and appeared to have some double vision.

On cross-examination, Mr. Watkins denied telling the appellant to leave the hospital in April 2007. He explained that the hospital staff asked the appellant to leave because the appellant made a commotion when Mr. Watkins objected to the appellant's saying he was

the victim's father. Mr. Watkins said there was a slight slope near the dumpsters in his daughter's apartment complex.

Pamela Watkins, Lakeisha Watkins' mother, testified that on April 16, 2007, she learned the victim was in the hospital. She said that the victim had bruises "all about his face" and that the appellant claimed the victim fell down a hill near the dumpsters. The victim stayed in the hospital overnight. The next day, he went to live with his grandfather for three weeks. Then he lived with Pamela Watkins for three weeks. She said she never saw the victim exhibit unusual behavior or have any seizures during that time. After the victim had been with his grandparents for six weeks, his mother took him home. In June 2007, the appellant telephoned Pamela Watkins and told her that the victim had stopped breathing and was in the hospital. She went to the hospital but never saw the appellant. About two days before the victim went to the hospital, Lakeisha Watkins told her mother that she thought the victim had had a seizure.

On cross-examination, Pamela Watkins testified that she did not see the victim from the time he left her care until he returned to the hospital in June. She acknowledged that there was a slope at the dumpsters near her daughter's apartment and said that the slope was dangerous. She denied telling someone from the Department of Children's Services (DCS) that she fell near the dumpsters.

Detective Faye Okert of the MNPD testified that on June 15, 2007, she went to Vanderbilt Hospital to investigate a report of an injured seventeen-month-old child. She arrived just before midnight and photographed the victim. She also spoke with the victim's mother, grandparents, and a social worker. At that time, doctors did not know what was causing the victim's seizures, and Detective Okert did not have any reason to believe a crime had been committed. She interviewed the victim's mother two additional times, and all three interviews were recorded. Detective Okert never saw the appellant at the hospital. On June 18, Detective Okert visited the victim in the hospital, where she witnessed and video-recorded him having a seizure. She interviewed the appellant in person on June 20, recorded the interview, and played the video of the victim's seizure for the appellant. During the interview, the appellant mentioned someone named Michael who had spent the night at Lakeisha Watkins' apartment. Detective Okert said the police "tried to identify who he could be and never could figure out whether there was a Michael." On June 21, Detective Okert went to Watkins' apartment and photographed the dumpsters where the victim allegedly fell in April 2007. Detective Okert said that a neighbor telephoned 911 on April 16 and that the 911 call on June 15 was placed from Nicole Riley's telephone.

The State played the videos of the victim's seizure and the appellant's June 20 interview for the jury. During the appellant's interview, he told Detective Okert the

-5-

following: The appellant had been living with Lakeisha Watkins for nine or ten months. On the morning of April 16, 2007, Watkins went to the dentist, and the appellant babysat the victim. While Watkins was gone, the appellant took out the trash. The victim went with him, ran down a hill, and fell. The victim was "alright at first," but his lip was "busted." Later, a knot appeared on his head, and the appellant told Watkins to call an ambulance. The victim fell near the dumpster about 11:00 a.m., but the appellant and Watkins did not call for help until 7:00 p.m. because Watkins did not want to take the victim to the hospital. The appellant did not know anything about the bruises on the victim's face. He said that he had seen Watkins "pop" the victim previously for misbehaving and that he had "popped" the victim's hand one time.

On the morning of Wednesday, June 13, the victim had his first seizure while the appellant was changing his diaper. The victim's eyes rolled back into his head, but he did not "lock up." At the time, the appellant and Watkins did not know the victim was having a seizure; the appellant thought the victim was having a heat stroke because it was hot in the apartment. The appellant put the victim in front of a fan, and the victim "snapped out of it." The victim was "okay" and "running around." On Friday morning, June 15, the appellant awoke and noticed the victim was not in his playpen. Watkins and the appellant had a baby gate to prevent the victim from going downstairs, but they had failed to put the gate up. The appellant went downstairs and found the victim leaning on the couch. At some point, the victim started screaming, which was unusual, and Watkins gave him some Tylenol. Later that day, Watkins fed the victim bologna and bread. Then she handed the victim to the appellant and left the apartment to get something to eat. The appellant put the victim down, noticed his lips were blue, and noticed he was lifeless. The appellant panicked and yelled for someone to call the police. The appellant did not know cardio pulmonary resuscitation (CPR) but blew into the victim's mouth and "pressed" on the victim. A female neighbor performed CPR and got the victim to breathe.

About forty-five minutes into the interview, the victim told Detective Okert for the first time that someone named Michael spent Thursday night, June 14, in the apartment. However, the appellant did not think Michael hurt the victim. The appellant denied "thumping" the victim or pushing him down. He also denied ever going into a room with the victim, shutting the door, and causing a "thud" in the room. The appellant said he had seen Watkins "thump" and "pop" the victim previously. However, he said that Watkins was a wonderful mother and that he did not think she hurt the victim.

Dr. Lawrence Stack, an ER physician at Vanderbilt Hospital, testified as an expert in emergency medicine that he and a resident physician examined the victim on April 16, 2007. According to the victim's medical records, the victim's "stepfather" said that about 11:00 a.m., the victim fell "flat on his face" while they were walking down a hill to take out the

-6-

trash. The victim developed bruises on his forehead and multiple abrasions on his upper extremities and face. He also had been sleeping since the fall. Dr. Stack noticed the victim was fussy and had no response when Dr. Stack tried to open his eyes. The victim had multiple bruises on his forehead, face, upper arms, and shoulders, and a fall did not adequately explain the victim's injuries. Dr. Stack initiated a non-accidental trauma plan that included a skeletal survey, a CT scan, social services, and DCS. Although the CT scan showed no evidence of trauma to the brain, Dr. Stack diagnosed the victim with a concussion, which Dr. Stack explained was a disruption of brain function caused by significant force. The victim was admitted to the hospital in order for a Care Team to evaluate his bruises and home environment.

On cross-examination, Dr. Stack testified that the radiologist who read the victim's CT scan found an arachnoid cyst in the victim's brain. However, the radiologist considered the cyst to be benign. Therefore, Dr. Stack saw no connection between the cyst and the victim's injuries. Although the victim was cleared for discharge from the ER at 10:20 p.m., he was admitted to the hospital for the Care Team evaluation. Dr. Stack acknowledged that the victim's grandfather did not want the victim to be around the appellant. The grandfather's concern raised Dr. Stack's suspicion. Dr. Stack said that he did not see the victim lose consciousness but that the victim was fussy, which was abnormal behavior.

On redirect examination, Dr. Stack testified that a physician could not see a concussion on a CT scan and that a concussion was a clinical diagnosis. The resident physician who treated the victim wrote in her report that the victim had three linear petechiae in a slap pattern on his left cheek and that he had abrasions and swelling on his lower lip.

Jessica Mitchell testified that in April 2007, she was Watkins' next door neighbor. The appellant was Watkins' boyfriend. Mitchell saw him go in and out of Watkins' apartment every day, and the appellant told Mitchell that the victim was his son. About 4:00 p.m. on April 16, Watkins asked Mitchell to drive her and the victim to the hospital. Mitchell said the appellant "was going looking for a ride -- another ride, I guess, on his own terms." Mitchell told Watkins that she would take Watkins and the victim to the hospital after her children got home from daycare. The victim kept going to sleep. Mitchell thought he needed medical attention and called 911.

On cross-examination, Mitchell testified that sometime later, she saw the victim at a birthday party for Nicole Riley's child. She said the victim was awake and alert but "looked like he was sick or something."

On redirect examination, Mitchell acknowledged that a "blow-up bouncy" toy for children to jump in was at the party. However, Mitchell did not see the victim jump or

interact with other children. She said the victim "wasn't involved with nothing," so she thought something was wrong with him.

Nicole Riley, the appellant's cousin, testified that in June 2007, she was Watkins' neighbor. The appellant was Watkins' boyfriend, bought food for Watkins and the victim, and seemed to like the victim. On the afternoon of Wednesday, June 13, Riley had a birthday party for her son and invited the victim. The appellant brought the victim to the party. Riley said the victim "didn't ever move, he didn't ever talk, he didn't ever play. . . . He just stood there." Riley gave the victim a popsicle, and he ate it. She said that when Watkins arrived at the party, the victim "busted into tears." Riley said Watkins grabbed the victim by the arm or wrist, "jerked him up off the porch," and took him home. Watkins and the victim later returned to the party, and Watkins got into the bounce-toy with him. However, the victim would not play. Riley did not see the victim have any seizures.

On cross-examination, Riley testified that Watkins often got mad when the appellant left the apartment and that Watkins "slammed the door and stuff like that." The State showed Riley a photograph of the victim's bedroom, and she identified a baby gate. She said that she gave the baby gate to the appellant so that the victim would not fall down the stairs in Watkins' apartment.

Latoya Starks testified that in June 2007, she lived in an apartment across from Lakeisha Watkins' apartment but did not know Watkins or the appellant. One night, Starks was on her porch when she saw the appellant run out of Watkins' apartment. The appellant yelled for help, said his son was not breathing, and was in a panic. Starks and some other people ran to Watkins' apartment and went upstairs. The victim was lying on the floor, was purple, and was not breathing. Someone tried to give the victim CPR, but it did not help, so Starks left and got her friend, Barbara Miller, to go to Watkins' apartment. Starks said Miller performed CPR on the victim and "brought him back." The victim was coughing, and Starks asked what was in his mouth. The appellant told her it was bread and bologna. Starks said that the bologna "never came up" but that she saw bread in the corner of the victim's mouth. They carried the victim downstairs just as Watkins walked into the apartment. Watkins pulled the bread out of the corner of the victim's mouth, shook the victim, and smacked the victim's face. Starks said Watkins told the victim to "stay with me, stay with me." Starks said that the victim "went out again," that Miller performed CPR again, and that the victim "came back." Starks said it was hot in the apartment.

Dr. Sandra Moutsios, a pediatrician and internist at Vanderbilt Hospital, testified as an expert in pediatric medicine and child abuse evaluation. When the victim came to the ER on June 15, 2007, he received treatment for continuous seizures and was stabilized. He continued to have seizures intermittently for one and one-half hours and received multiple

intravenous medications to stop them. He also had a CT scan, an MRI, a skeletal survey, and an opthamologic exam. On June 17, Dr. Moutsios was a member of the Care Team that evaluated the victim in the hospital's intensive care unit. Dr. Moutsios said that the Care Team was the consultation service responsible for evaluating children suspected of being abused and that she conducted a "head to toe" examination of the victim. The victim was not very responsive and would not open his eyes in response to voice. The victim moved all of his extremities minimally, but spontaneously, and moved his right side more than his left. The victim made sounds with his mouth and gritted his teeth. Dr. Moutsios said that his heart, lungs, and abdomen were normal and that "[i]t was his mental status that was most concerning."

Dr. Moutsious spoke with Lakeisha Watkins. She said Watkins told her the following: About noon on Wednesday, June 13, the victim had an episode of crying, gritting his teeth, and locking his joints. His eyes also rolled backed into his head. The episode lasted five minutes and resolved on its own, and the victim behaved normally for the rest of the day. On Thursday, June 14, the victim attended a birthday party. He and his mother jumped in a "bounce factory type attraction," and the victim used his arms and legs normally. On Friday, June 15, Watkins awoke about 8:00 a.m. and discovered that the victim had crawled out of his playpen. She found him downstairs, standing by the couch with his head and arms resting on the couch. Watkins thought the victim was tired and put him into bed. He had an episode of screaming, crying, clenching his hands, and extending all four extremities, but the episode resolved in a few minutes. The victim would not walk, so Watkins carried him to a seat for breakfast. The victim ate cereal and drank milk. Watkins thought he was in pain, gave him Tylenol, and put him in his playpen with a fan. The victim did not want to walk and was sleepy for the rest of the day. About 10:00 p.m., Watkins left the victim with the appellant and went to get something to eat. When she returned to the apartment, the appellant was standing at the door, yelling for help, and saying that the victim was not breathing. Watkins found the victim upstairs, lying on the floor and gasping for breath. The appellant had tried to give the victim CPR, but the victim was not breathing. A neighbor gave the victim CPR, and the victim began breathing. Paramedics arrived at 10:15 p.m. Dr. Moutsious said that Watkins demonstrated the victim's episodes from Wednesday, Friday morning, and Friday night. From the demonstrations, Dr. Moutsious thought victim was having "tonic clonic" seizures. Dr. Moutsious said she was "concerned" that the victim had sustained a head injury prior to the seizures.

Dr. Moutsious testified about the victim's skeletal survey, opthalmologic exam, CT scan, and MRI. The victim's skeletal survey revealed a fracture to his left arm bone near the wrist. She described the fracture as a "buckle fracture," meaning "there was some course that caused the outside layer of the bone to actually buckle." Significant force caused the fracture, which had started to heal. Dr. Moutsious estimated that the victim's arm was

-9-

broken one to two weeks before he was brought to the hospital on June 15; the fracture did not occur within one or two days of June 15. She said that the fracture could have resulted from the "bending of the bone" and that "[w]e see that sometimes in older athletes that end up on an outstretched wrist and the bone buckles." She said the fracture also could have resulted from a "twisting mechanism." She said that the arm would have been painful, that she would have expected the victim to cry and not use the arm, and that some swelling could have appeared over the fracture.

Dr. Moutsious testified that the victim had extensive bilateral retinal hemorrhages in his eyes, showing a severe brain injury caused by significant and severe force. For the first two weeks the victim was in the hospital, Dr. Moutsious could not get him to track light or sound. She said that if the victim's brain was injured on June 15, she would have expected the victim's caregiver to have noticed he was not acting normal. In the ER, the victim's CT scan was quickly read as normal. However, when it was re-read in the Pediatric Intensive Care Unit, the victim was found to have a subdural hematoma. The victim's MRI revealed subdural and subarachnoid hemorrhages, also known as bleeding in the brain, on the right side. The bleeding was caused by a lateral force or shake. The victim went for some period of time without breathing, which deprived the central part of his brain of oxygen. She said the victim could have easily died on Friday night.

Dr. Moutsious testified that the victim's MRI showed some of the "bleeds" in his brain were acute, meaning they occurred within a couple of days from the time the victim stopped breathing. Although Dr. Moutsious could not say exactly when the bleeds occurred, she stated that "there's great concern that something happened just before this child stopped breathing" and that "when we see children present with such severe episodes of stopping breathing and seizure, that oftentimes, there's an injury that happened within minutes." The victim's most severe bleeding caused him to have the Friday-night seizure and trouble breathing. The victim's brain was permanently injured, and Dr. Moutsious did not think he would have been able to eat after he sustained the injury. She stated that if care had been sought for the victim prior to the Friday-night seizure, the victim "may not have progressed to that point and we could have potentially prevented that." She said that based on the victim's MRI, it was "certainly possible" that the victim also sustained prior, less-severe brain bleeds. In her opinion, the victim had a brain injury prior to the Wednesday seizure. She stated that in her opinion, the victim sustained multiple injuries to his brain, that he sustained non-accidental trauma to his brain, and that his wrist injury was non-accidental.

On cross-examination, Dr. Moutsious testified that if the victim ate bologna and bread on Friday night, then the brain injury likely happened afterward because it would have been unusual for a child to have eaten right after a seizure. She said she did not know bread and bologna was found in the victim's mouth, and she acknowledged that food in the victim's

mouth could have affected his breathing. She said she found it "curious" that the victim reportedly had a seizure on Wednesday but played and jumped at the birthday party on Thursday. She also said that the victim's being in the hospital in April 2007 "raised [her] level of concern" about the injuries he sustained in June 2007. She acknowledged that the victim's CT scans in April and June showed an arachnoid cyst within the outside layers of his brain. However, she described the cyst as an "incidental finding" because the victim's radiologist and neurologist did not think the cyst was significant or related to his injuries. She acknowledged that the bleeding in the victim's brain was due to injuries at different times. She reiterated that one bleed was acute, meaning it occurred within a couple of days, but that some of the bleeds "were called consistent with possible old subdurals [and] would have been older than two weeks." Lakeisha Watkins never told her that the victim had a history of falling down the apartment stairs.

On redirect examination, Dr. Moutsious testified that in her opinion, a fall down the stairs did not cause the victim's injuries because the injuries were of different ages and locations. She stated, "I don't think this is a one event trauma for this child." She acknowledged that given what happened to the victim in June, his injuries in April were more likely the result of non-accidental trauma. She stated that the victim's choking did not explain his June injuries. She acknowledged that the likely sequence of events for the victim's June injuries was as follows: Trauma to the victim's brain, subdural and subarachnoid hemorrhages, and difficulty breathing. She stated that "it's difficult to say whether [the] brain injury caused him to stop breathing or [the] seizure caused him to stop breathing. But with that addition, I believe that's the sequence of events."

Lakeisha Watkins, the victim's mother, acknowledged that she was the appellant's co-defendant in seven of the eight counts and testified that she had not been promised anything in exchange for her testimony.[2] Watkins said she attended special education classes in high school and did not graduate but received a certificate of attendance. The victim was born in January 2006, and Watkins did not work after he was born. She supported herself and the victim with assistance from the Families First program, food stamps, and help from her parents. Watkins met the appellant in 2007 and was pregnant with his child at the time of the events in question. The appellant played with the victim sometimes and changed his diaper. She said that the appellant did not pay for food and that he was "not really" the victim's caretaker. However, Watkins would leave the victim in the appellant's care about once per week for two or three hours.

---

[2]At the time of the appellant's trial, a jury already had convicted Watkins of attempted child neglect as a lesser-included offense of child neglect in count 2 of the indictment; aggravated child abuse in counts 3, 6, 7, and 8; and aggravated child neglect in count 4. See State v. Lakeisha Margaret Watkins, No. M2009-02607-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 523, at *1 (Nashville, July 8, 2011).

Watkins testified that on April 16, 2007, she went to the dentist about 9:00 a.m. The victim stayed with the appellant. When Watkins returned home about noon, she saw that the victim had a large knot on his forehead and that he could not open his eyes. The appellant told Watkins that he and the victim were behind a dumpster, that the victim began running, that the victim let go of the appellant's finger, and that the victim fell. Watkins said that the victim had just started learning to run and that he could not run very fast. She did not see any other injuries on the victim and accepted the appellant's explanation. However, about thirty minutes later, the victim was still sleepy. The appellant did not want Watkins to call an ambulance, so Watkins went to Jessica Mitchell's house. Mitchell had a car, and Watkins asked Mitchell to drive her and the victim to the hospital. Mitchell said she would drive them. However, about one hour later, Mitchell told Watkins that something was wrong with the car. About 6:00 p.m., Mitchell called an ambulance, and paramedics took the victim and Watkins to the hospital. The appellant arrived at the hospital about twenty or thirty minutes later, and he and Watkins spoke with doctors. The appellant told the doctors that he was the victim's stepfather. Watkins got upset with the doctors because they said they were going to take the victim away from her. They questioned her about other bruises on the victim, but she did not have an explanation for the bruises. She said she could not explain why she waited to call an ambulance for the victim.

Watkins testified that when the victim got out of the hospital, he stayed with her parents. At some point, the victim's parents asked Falonda Tolston if the victim could go back to Watkins. Tolston told them yes but that she first had to check Watkins' apartment. Tolston visited Watkins' apartment after the victim returned to live with Watkins. Watkins lied to Tolston by telling Tolston that she and the appellant had ended their relationship, and Tolston allowed the victim to remain with Watkins. Watkins said her parents did not approve of her relationship with the appellant but approved of the appellant's being around the victim.

Watkins testified that about two days before the victim's June admission to the hospital, she and the victim went to a birthday party hosted by Nicole Riley. Watkins said Riley had a "bounce machine" at the party. Watkins said that she tried to get the victim to play in the machine but that he "was just sitting there." About noon on Wednesday, June 13, the victim had his first seizure while Watkins was taking out the trash. She said that she did not see the seizure but that the appellant told her the victim was "locking up" his left arm and grinding his teeth. Watkins did not get medical help for the victim at that time because she was scared. The victim acted normal for the rest of the day, and the appellant told her not to call an ambulance because the appellant did not think the victim's condition was serious.

Watkins testified that on Friday, June 15, she awoke about 9:00 a.m. The appellant and the victim were in the victim's bedroom, and the appellant was cleaning the room. Watkins heard the victim screaming and crying, got out of bed, and went into the victim's

bedroom. The appellant was holding the victim. She said the appellant told her that he found the victim downstairs, "asleep standing up." About five minutes later, the victim had a seizure. The seizure lasted five to ten minutes, and the victim was weak and sleepy afterward. Watkins was worried, but the appellant told her not to call an ambulance. Watkins gave the victim Tylenol and let him sleep for about one hour. Then she gave him Fruit Loops and milk. Watkins still wanted to call an ambulance for the victim, but the appellant told her not to call. For the rest of the day, the victim acted weak and sleepy. Watkins said she wanted to get help for the victim but was scared he would be taken away from her.

Watkins testified that about 9:45 p.m., the appellant suggested that she leave the apartment to get something to eat. He offered to watch the victim. Watkins had just fed the victim pieces of bologna and bread. The victim did not have any trouble eating and did not choke. The victim was not having trouble breathing, and he was awake in his room when Watkins left the apartment. She said she was gone from the apartment about five minutes. When she returned, the appellant was outside. He yelled her name and said the victim was not breathing. Watkins ran inside and upstairs to the victim's bedroom. The victim was lying on the floor, and Watkins picked him up. A neighbor came in and performed CPR. One of the appellant's cousin's telephoned 911, and Watkins told the operator that the victim was not breathing. Watkins said that she shook the victim and told him to wake up but that she did not shake him back and forth or slap his face.

Watkins testified that she had seen the appellant use his fingers to "thump" the victim's head previously. One time, she saw the appellant pull the victim's shirt up over the victim's head and let the victim run into a wall. She also saw the appellant push the victim, causing him to fall on his buttocks and cry. Watkins spoke with the police and told them that the appellant would take the victim into the victim's bedroom and "[fuss] or [holler]" at the victim. She acknowledged that she asked the appellant to discipline the victim because she could not "handle it." She said that the appellant would take the victim into another room to discipline him and that she assumed the appellant just talked to the victim. She said she lied to the police and the assistant district attorney general by telling them that the appellant would close the door and that she would hear loud thumps in the room. Although she acknowledged lying to the police, she maintained that she saw the appellant shove the victim and thump his forehead.

Watkins testified that the appellant must have caused the bruises on the victim's head, face, and upper arms in April 2007 because "he was the only one that was taking care of him at the time." She said that the victim's June 2007 injuries resulted "[f]rom not calling the ambulance when I was supposed to." The victim never complained about his wrist, and Watkins did not know how he broke his wrist. She said she truthfully told the police that she saw the appellant "jerk" the victim's arm one time. She said that the appellant jerked the

victim's arm during the week of June 15, 2007, and that the victim started crying.

On cross-examination, Watkins acknowledged that from April to June 2007, the appellant spent a lot of time at her apartment but also was gone a lot. The appellant was not very helpful and did not do a lot of activities with the victim. She acknowledged that the appellant took the victim for walks. She also acknowledged that a man named Michael spent the night of Thursday, June 14, in the apartment. She thought Michael left the apartment about 5:00 a.m. on Friday morning because that is what time he told her he was going to leave. She acknowledged that she would get frustrated with the victim and said that she would let the appellant discipline him because she was "afraid that [she] would go overboard." She said she spoke with the police three times in June 2007 but did not tell them she pushed the victim or caused some of his injuries. At first, Watkins denied telling the police that she hit the victim with a belt. However, she acknowledged demonstrating for the police how she used a belt to hit the victim. She then acknowledged using a belt to discipline the victim but said she used a belt only one time. She denied telling the police that she hit the victim with a belt every day. She said she never went overboard in disciplining the victim.

On redirect examination, Watkins acknowledged telling the police that she heard the appellant force the victim "up against the wall" four times and "against the floor" twice. However, she said she lied to the police. She said she truthfully told the police that the appellant yelled at the victim, told him to stop crying, and called him a "momma's boy." She said Michael slept downstairs on the night of June 14, that the victim slept upstairs, and that Michael never had contact with the victim.

At the close of the State's proof, the State made the following election of offenses: Count 1, the appellant committed aggravated child abuse on or about April 16, 2007, by causing severe head injuries to the victim, including a concussion, inability to open his eyes, and multiple facial bruises; count 2, the appellant committed child neglect by failing to seek timely medical treatment for head injuries the victim sustained on April 16, 2007; count 3, the appellant committed aggravated child abuse on or about June 15, 2007, by causing severe head injuries to the victim, including anoxic brain damage, acute subdural and subarachnoid hemorrhages, retinal hemorrhages, and severe seizures; count 4, the appellant committed aggravated child neglect by neglecting the victim's welfare and failing to seek timely medical treatment for seizures the victim experienced on the morning of June 15, 2007, and his "decreased physical abilities throughout that day"; count 5, the appellant committed aggravated child neglect by neglecting the victim's welfare and failing to seek timely medical treatment for the seizures the victim experienced on or about Wednesday, June 13, 2007; count 6, the appellant committed aggravated child abuse by causing a subdural hematoma and other brain trauma to the victim between May 29 and June 15, 2007; and count 7, the

-14-

appellant committed aggravated child abuse by causing a fracture to the victim's left ulna between May 29 and June 15, 2007. The jury convicted the appellant as charged.

## II. Analysis

### A. Motion to Sever

The appellant contends that the trial court erred by failing to grant his motion to sever counts 1 and 2, which occurred in April 2007, from the remaining counts, which occurred in June 2007. The State acknowledges that the trial court erred by failing to grant the severance motion but argues that the error was harmless. We agree with the State.

Before trial, the appellant filed a motion to sever the offenses allegedly committed in April 2007 from the offenses allegedly committed in June 2007. In the motion, the appellant argued that severance was necessary because one trial would "threaten the unanimity of any verdicts" and because the proof was going to be complex and require the jury "to make an immense number of legal and factual distinctions." In a written response, the State argued that the trial court should deny the motion because "the defendants evidenced a common scheme or plan to abuse and neglect the victim" and because the offenses were part of the same criminal transaction. The State also argued that one trial was necessary to establish identity and absence of mistake or accident and to provide a contextual background. In a written order, the trial court concluded that the April and June episodes were part of a common scheme or plan and that evidence from one trial would be admissible in a second trial to establish identity, intent, and lack of mistake or accident.

Tennessee Rule of Criminal Procedure 8(b) states that two or more offenses may be joined in the same indictment if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character. Tenn. R. Crim. P. 8(b)(1), (2). Tennessee Rule of Criminal Procedure 13(b) provides that the trial court may order severance of offenses prior to trial if such severance could be obtained on motion of a defendant or the State pursuant to Rule 14. Rule 14(b)(1) provides that "[i]f two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others."

Our supreme court has held that "decisions to consolidate or sever offenses pursuant to Rules 8(b) and 14(b)(1) are to be reviewed for an abuse of discretion." State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). "A holding of abuse of discretion reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case." State v. Moore, 6 S.W.3d 235,

242 (Tenn. 1999).

In examining a trial court's ruling on a severance issue, the primary consideration is whether the evidence of one offense would be admissible in the trial of the other if the offenses remained severed. See Spicer v. State, 12 S.W.3d 438, 445 (Tenn. 2000). Essentially, "any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is 'really a question of evidentiary relevance.'" Id. (quoting Moore, 6 S.W.3d at 239). As such, the trial court must determine from the evidence presented that

> (1) the multiple offenses constitute parts of a common scheme or plan, (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses, and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

Id. (citations omitted).

This court previously has concluded, "A common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), overruled on other grounds by Spicer, 12 S.W.3d at 447. Typically, common scheme or plan evidence tends to fall into one of the following three categories:

> (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction.

Moore, 6 S.W.3d at 240.

Turning to the instant case, the offenses did not reveal a distinctive design and were not so similar as to constitute "signature" crimes. Moreover, the April offenses alleged in counts 1 and 2 were not part of the same criminal transaction as the June offenses alleged in counts 3 through 7. Regarding whether the offenses were part of a larger, continuing plan or conspiracy, our supreme court has explained that "a larger plan or conspiracy in this context contemplates crimes committed in furtherance of a plan that has a readily distinguishable goal, not simply a string of similar offenses." State v. Denton, 149 S.W.3d 1, 15 (Tenn. 2004). Therefore, we conclude that the April and June offenses were not part of a continuing plan or conspiracy, and the first prong of Rule 14(b)(1), that the offenses

were part of a common scheme or plan, was not met. The trial court should have granted the appellant's severance motion.

The State argues that the trial court's error was harmless because the evidence against the appellant was overwhelming.

> Whether a trial court should grant a severance under Tennessee Rule of Criminal Procedure 14(b)(1) involves primarily an evidentiary question, therefore, "the effect of a denial of that right is weighed by the same standard as other non-constitutional evidentiary errors: the defendant must show that the error probably affected the judgment before reversal is appropriate."

Id. at 15 (quoting Moore, 6 S.W.3d at 242).

We agree with the State that the trial court's failure to grant a severance in this case was harmless error. Regarding count 1, the evidence established that the appellant was the victim's sole caregiver on the morning of April 16; that the victim suffered a concussion, bruises, and knots while he was in the appellant's care; and that a fall did not explain the victim's injuries. Regarding the appellant's remaining convictions, the evidence established that the victim was in the exclusive care of his mother and the appellant from May 29 to June 15 and that he suffered numerous brain bleeds during that time. At trial, the defense suggested to the jury that the victim was injured by falling down the stairs. However, Dr. Moutsious testified that a fall down the stairs did not account for the number, location, and severity of the victim's injuries. Therefore, we agree with the State that the trial court's failure to grant the appellant's severance motion was harmless. See Tenn. R. App. P. 36(b); State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008).

### B. Accomplice Instruction

The appellant argues that the trial court erred by instructing the jury that Lakeisha Watkins was an accomplice as a matter of law because the instruction amounted to a judicial comment on the evidence. The State argues that the trial court properly instructed the jury. We conclude that the appellant is not entitled to relief on this issue.

At the conclusion of Watkins' testimony, the trial court informed the parties that "I have added about Lakeisha Watkins being an accomplice." Defense counsel answered, "Okay. Fine." The trial court continued, "And I am instructing that she is an accomplice and that her testimony would have to be corroborated." Defense counsel stated, "Fine." During

-17-

the jury charge, the trial court instructed the jury as follows:

> In this case, the Court charges you that the witness, Lakeisha Watkins, was an accomplice in the alleged offenses, and before the defendant can be convicted, you must find that this accomplice testimony has been sufficiently corroborated.
>
> An accomplice is a person who knowingly, voluntarily and with common intent with a defendant, unites with him or her in the commission of an offense.

After the trial court finished instructing the jury, defense counsel asked for a bench conference. During the conference, counsel stated,

> I apologize for not mentioning this earlier, but I ran into this. My problem is with the first sentence of the accomplice charge here, saying, the Court charges you that she was an accomplice. . . . The Court doesn't mean that. But it might infer to the Jurors that you're finding that she was an accomplice. I mean, as a matter of fact[.]

The trial court stated, "She is. I have to tell them. This is the law in this case. It's not whether they find her as an accomplice. She was."

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). A charge resulting in prejudicial error is one that fails to fairly submit the legal issues to the jury or misleads the jury about the applicable law. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

An accomplice is someone who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." State v. Griffis, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997). Generally, the question of a witness's status as an accomplice is answered by determining whether that person could have been indicted for the charged offense. State v. Boxley, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). If the facts about the witness's participation in the crime are clear and undisputed, the trial court must declare the witness to be an accomplice as a matter of law and instruct the jury that the accomplice's testimony must be corroborated. State v. Eric Ricardo Middleton, No. W2010-01427-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 833, *47 (Tenn. Crim. App. Nov. 14, 2011) (citing State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990)). However, if the facts are disputed or subject to

-18-

different inferences, the jury should determine as a question of fact whether the witness was an accomplice. State v. Anderson, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997).

Initially, we note that the appellant failed to object when the trial court stated that it was going to give the accomplice as a matter of law instruction and failed to make a contemporaneous objection during the jury charge. See Tenn. R. App. P. 36(a). In any event, Watkins was indicted as a co-defendant in all but one of the counts, and a jury found her guilty prior to the appellant's trial. Therefore, Watkins was an accomplice as a matter of law with regard to counts 2 through 7, and the trial court properly instructed the jury. As to count 1, Watkins testified that she was not present when the victim's injuries occurred on April 16, and she was not charged with causing his injuries. Therefore, she was not an accomplice as a matter of law with regard to that count. However, as noted by the State, the trial court's instruction held the State to a higher burden, requiring the jury to find that her testimony was corroborated. Therefore, the State has demonstrated that any error regarding the trial court's instruction was harmless. See Rodriguez, 254 S.W.3d at 371.

C. Sufficiency of the Evidence

The appellant argues that the evidence is insufficient to support the convictions. When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. See id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'"

State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting State v. Marable, 313 S.W.2d 451, 457 (Tenn. 1958)).  "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

### 1.  Aggravated Child Abuse - Counts 1, 3, 6, & 7

The appellant contends that the evidence is insufficient to support his aggravated child abuse convictions.  A defendant is guilty of aggravated child abuse when the defendant commits the offense of child abuse and the conduct results in serious bodily injury to the child. Tenn. Code Ann. § 39-15-402(a)(1).  Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury."  Tenn. Code Ann. § 39-15-401(a).  "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result."  Tenn. Code Ann. § 39-11-302(b).  Bodily injury "includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]"  Tenn. Code Ann. § 39-11-106(a)(2).  At the time of the appellant's trial, serious bodily injury was defined as bodily injury that involved

> (A) a substantial risk of death;
>
> (B) Protracted unconsciousness;
>
> (C) Extreme physical pain;
>
> (D) Protracted or obvious disfigurement; or
>
> (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty.

Tenn. Code Ann. § 39-11-106(a)(34)(A)-(E).[3]

_____

[3]We note that in July 2009, two months before the appellant's trial, our state code was amended to define "serious bodily injury to the child" in Tennessee Code Annotated Section 39-15-402(d) as

> includ[ing], but . . . not limited to, second-or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted

(continued...)

The trial court instructed the jury on criminal responsibility. A defendant is criminally responsible for an offense committed by another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the [defendant] solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). "'[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred.'" State v. Dorantes, 331 S.W.3d 370, 386 (Tenn. 2011) (quoting State v. Phillips, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001)). In addition, "no specific act or deed need be demonstrated." Id. (citing State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)). A defendant also is criminally responsible for an offense committed by another if,

> [h]aving a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to take a reasonable effort to prevent commission of the offense.

A step-parent and caretaker has a duty to protect a child from harm and provide the child with emergency attention. State v. Hodges, 7 S.W.3d 609, 623 (Tenn. Crim. App. 1998).

For count 1, the State alleged that the appellant committed aggravated child abuse on or about April 16, 2007, by causing severe head injuries to the victim, including a concussion, inability to open his eyes, and multiple facial bruises. The appellant asserts that the evidence is insufficient to support the conviction because it failed to establish that the victim suffered serious bodily injury. The evidence shows that the victim's eyes were swollen shut, that he had numerous bruises and abrasions on his face and upper body, and that he had knots on his head. He also had a concussion, which Dr. Stack explained was a disruption in brain function, and would not open his eyes. In our view, such injuries, particularly in a seventeen-month-old child, qualify as serious bodily injury. Therefore, the evidence is sufficient to support the conviction.

For count 3, the State alleged that the appellant committed aggravated child abuse on or about June 15, 2007, by causing severe head injuries to the victim, including anoxic brain damage, acute subdural and subarachnoid hemorrhages, retinal hemorrhages, and severe

---

[3](...continued)
disfigurement, including those sustained by whipping children with objects.
Moreover, "[a] broken bone of a child who is eight (8) years of age or less" was added to the list for serious bodily injury in Tennessee Code Annotated section 39-11-106(a)(34).

seizures. The appellant asserts that the evidence is insufficient to support the conviction because the evidence is entirely circumstantial and indicates the victim's mother caused the injuries. Dr. Moutsious testified that the victim had bleeds in his brain and that one of the bleeds occurred within a couple of days of June 15. Although Dr. Moutsious could not say precisely when the bleed occurred, she was concerned that the victim had sustained a brain injury within minutes of the time he stopped breathing. The evidence demonstrated that the appellant and Watkins were the victim's sole caregivers in the days leading up to the victim's June hospitalization. Watkins told the police that she allowed the appellant to discipline the victim, that he took the victim into a room and shut the door, and that she heard thuds in the room. Moreover, the evidence showed that the appellant was alone with the victim just before the victim experienced the seizure that caused him to stop breathing. Therefore, the evidence is sufficient to show that the appellant caused the anoxic brain damage, acute subdural and subarachnoid hemorrhages, retinal hemorrhages, and severe seizures that the victim suffered on or about June 15.

For count 6, the State alleged that the appellant committed aggravated child abuse by causing a subdural hematoma and other brain trauma to the victim between May 29 and June 15, 2007. The appellant argues that the evidence is insufficient to support the conviction because (1) the State failed to show that the victim suffered a subdural hematoma and brain trauma other than the subdural hematoma and brain trauma related to count 3, (2) the State failed to show that the victim suffered serious bodily injury, and (3) the evidence does not ensure juror unanimity. Dr. Moutsious testified that the victim suffered multiple brain injuries that were caused by significant force. She said that while one of the victim's brain bleeds occurred within a couple of days of June 15, other bleeds were older than two weeks. In her opinion, the victim had a brain injury before the Wednesday, June 13, seizure. As stated above, Watkins and the appellant were the victim's sole caregivers, and Watkins testified that the appellant pushed the victim and "would thump" the victim when the appellant disciplined the victim. Also, in her statement to police Watkins said that she heard thuds when the appellant disciplined the victim. Therefore, the evidence is sufficient to show that the appellant caused prior brain trauma to the victim, which resulted in older brain bleeds. Moreover, we are unpersuaded by the appellant's claim that the victim did not suffer serious bodily injury. Bleeding in the brain, particularly bleeding that causes a seizure such as the one the victim experienced on Wednesday, June 13, involves substantial impairment of a function of a bodily organ. The evidence is sufficient to support the conviction for aggravated child abuse in count 6.

For count 7, the State alleged that the appellant committed aggravated child abuse by causing a fracture to the victim's left ulna between May 29 and June 15, 2007. The appellant argues that the evidence is insufficient to show he committed aggravated child abuse because the evidence fails to show that the victim suffered serious bodily injury. Dr. Moutsious

testified that the victim's broken ulna would have been painful, that she would have expected him not to use the arm, and that some swelling could have appeared over the fracture. However, her testimony is insufficient to establish that the victim suffered extreme physical pain, that he sustained substantial impairment of his arm, or that he sustained protracted or obvious disfigurement. Therefore, we conclude that the evidence is insufficient to support the appellant's conviction for aggravated child abuse in count 7.

### 2. Child Neglect and Aggravated Child Neglect - Counts 2, 4, & 5

The appellant contends that the evidence is insufficient to support his child neglect and aggravated child neglect convictions. As charged in the indictment, a defendant is guilty of child neglect when the defendant knowingly, other than by accidental means, neglects a child under six years of age, so as to adversely affect the child's health and welfare. Tenn. Code Ann. § 39-15-401(a) (2006). Aggravated child neglect occurs when the act of child neglect results in serious bodily injury to the child. Tenn. Code Ann. § 39-15-402(a)(1).

For count 2, the State alleged that the appellant committed child neglect by failing to seek timely medical treatment for head injuries the victim sustained on April 16, 2007. The appellant contends that the evidence is insufficient to support the conviction because the State failed to prove that the appellant's failure to seek timely medical attention for the victim affected the victim's health and welfare. The State does not address the merits of issue. We agree with the appellant that the evidence is insufficient to support his conviction for child neglect. In order to sustain a conviction for child neglect, the proof must establish "an actual, deleterious effect upon the child's health and welfare." State v. Mateyko, 53 S.W.3d 666, 669 (Tenn. 2001). The victim allegedly fell at 11:00 a.m., and paramedics transported him to the ER about 6:30 p.m. Dr. Stack diagnosed the victim with a concussion but medically cleared him for discharge at 10:20 p.m. Although the State proved that the appellant delayed seeking medical treatment for the victim, the State failed to show that the delay itself adversely affected the victim's health and welfare. Therefore, the evidence is insufficient to support the conviction for child neglect in count 2.

For count 4, the State alleged that the appellant committed aggravated child neglect by neglecting the victim's welfare and failing to seek timely medical treatment for seizures the victim experienced on the morning of June 15, 2007, and his "decreased physical abilities throughout that day." The appellant contends that the State failed to prove that his failure to seek timely medical attention for the victim resulted in serious bodily injury. Taken in the light most favorable to the State, the evidence shows that the victim suffered a seizure on the morning of June 15 and that Watkins gave him Tylenol because she thought he was in pain. The victim was sleepy and weak for the rest of the day. Watkins was worried about the victim, but the appellant told her not to call an ambulance. The appellant and Watkins did

-23-

not seek medical attention for him until he stopped breathing on the night of June 15, which resulted in the victim's permanent brain injury. The evidence is sufficient to support the appellant's conviction for aggravated child neglect in count 4.

For count 5, the State alleged that the appellant committed aggravated child neglect by neglecting the victim's welfare and failing to seek timely medical treatment for the seizures the victim experienced on Wednesday, June 13, 2007. Again, the appellant contends that the State failed to prove that his failure to seek timely medical attention for the victim resulted in serious bodily injury. We agree with the appellant. We have already determined that the appellant's failure to get medical help for the victim after the Friday-morning seizure sustains the appellant's conviction for aggravated child neglect in count 4. However, the State presented no evidence to demonstrate that the appellant's failure to seek treatment for the victim after the Wednesday-morning seizure resulted in serious bodily injury separate and apart from the serious bodily injury established for count 4.

In sum, the evidence is insufficient to support the appellant's convictions for child neglect in count 2 and aggravated child abuse in counts 5 and 7. The evidence is sufficient to support his convictions for aggravated child abuse in counts 1, 3, and 6 and aggravated child neglect in count 4.

## D. Merger

Next, the appellant contends that the trial court erred by failing to merge his aggravated child neglect convictions in counts 4 and 5. The State concedes that the trial court should have merged the convictions. We have already determined that the evidence is insufficient to support the appellant's conviction in count 5. In any event, as correctly noted by the State, aggravated child neglect is a continuing course of conduct "beginning with the first act or omission that causes adverse effects to a child's health or welfare." State v. Adams, 24 S.W.3d 289, 296 (Tenn. 2000). The crime "continues until the person responsible for the neglect takes reasonable steps to remedy the adverse effects to the child's health and welfare caused by the neglect." Id. The State argued that the appellant should have sought medical treatment for the victim after the victim's first seizure on Wednesday. Given that the appellant's neglect was "continuous and without interruption" from the time of the victim's first seizure on Wednesday until the victim's Friday-night seizure, his dual convictions for aggravated child abuse in count 4 and 5 could not stand. Id. at 297.

## E. Sentencing

Finally, the appellant contends that his effective sentence is excessive because the trial court misapplied an enhancement factor and erred by ordering consecutive sentencing. The

State contends that the appellant's effective seventy-five-year sentence is proper. We agree with the State.

No witnesses testified at the appellant's sentencing hearing, but the State introduced the appellant's presentence report into evidence. According to the report, the then twenty-eight-year-old appellant was expelled from high school in the eleventh grade, never earned a GED, and had a one-year-old daughter. In the report, the appellant denied having any physical or mental disabilities but admitted using marijuana since he was thirteen years old. The report shows that the appellant worked as a laborer for Industrial Staffing from July 2006 to September 2007. According to the report, the appellant has two prior convictions for criminal trespassing and one prior conviction each for kidnapping, sexual battery, and casual exchange.

The trial court found that the following enhancement factors applied to all of the appellant's convictions: (1), that the appellant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (4), that the victim "was particularly vulnerable because of age or physical or mental disability"; and (14), that the appellant abused a position of private trust. Tenn. Code Ann. § 40-35-114(1), (4), (14). The trial court gave great weight to the factors. The trial court also applied enhancement factor (5), that the appellant "treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense," to the appellant's convictions in counts 3 through 7, but did not give the factor much weight. Tenn. Code Ann. § 40-35-114(5). The trial court noted that the range of punishment for the appellant's aggravated child abuse and aggravated child neglect convictions, Class A felonies, was fifteen to twenty-five years and that his range of punishment for the child neglect conviction, a Class E felony, was one to two years. See Tenn. Code Ann. § 40-35-112(a)(1), (5). The trial court sentenced the appellant as a Range I, standard offender to the maximum punishment in the range for all seven convictions.

Regarding consecutive sentencing, the trial court found the appellant to be a dangerous offender "whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). The trial court explained,

> This was a very young child who was severely abused. The
> defendant has been convicted of that. Now, the mere fact that
> I have found that factor four applies does not stop the inquiry
> because pursuant to Wilkerson I have to find that there's an
> aggregate term reasonably related to the severity of the offenses,
> and it's necessary to protect the public from further serious

-25-

criminal conduct by the defendant. He has previously been convicted of some very serious offenses involving sexual battery and kidnapping. He then -- on this particular series of events there's like three separate things that are going on. You've got the first incident in April, then you've got the broken arm, and then you've got the other. So I think that there is some need to -- for consecutive sentences in this particular case.

The trial court merged count 2 into count 1. The trial court ordered that the appellant's twenty-five year sentences in counts 3, 4, and 5 be served concurrently with each other and that his twenty-five year sentences in counts 6 and 7 be served concurrently with each other. However, the trial court ordered that the two effective twenty-five year sentences be served consecutively to each other and consecutively to his twenty-five year sentence in count 1 for a total effective sentence of seventy-five years in confinement.

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The appellant asserts that the trial court misapplied enhancement factor (5) regarding the victim's being treated with exceptional cruelty. In State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001), our supreme court concluded that the exceptional cruelty factor is applicable in cases of "extensive physical abuse or torture." In this case, the appellant's acts of abuse and neglect in April and June caused the victim to have a concussion, bleeding in the brain, retinal hemorrhages, and seizures. The trial court did not err by applying factor (5). In any event, the trial court gave great weight to enhancement factors (1), (4), and (14) but little weight to factor (5). Therefore, even if the court had misapplied enhancement factor (5), it would not have justified reducing the appellant's sentences.

-26-

The appellant also argues that the trial court erred by ordering consecutive sentencing. Specifically, the appellant contends that the State failed to establish that his effective seventy-five-year sentence is reasonably related to the severity of the offenses or necessary to protect the public.

In order to find that a defendant is a dangerous offender, a court must also find that (1) the sentences are necessary in order to protect the public from further misconduct by the defendant and that (2) the terms are reasonably related to the severity of the offenses. State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995); see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). In the instant case, the trial court found that the appellant had been previously convicted of serious offenses. The court also noted that the victim was severely abused in this case. The court properly addressed the Wilkerson factors. Accordingly, the appellant is not entitled to relief on this issue.

## III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the appellant's convictions of child neglect in count 2, aggravated child neglect in count 5, and aggravated child abuse in count 7 should be reversed and those charges dismissed. The appellant's convictions of aggravated child abuse in counts 1, 3, and 6; aggravated child neglect in count 4; and effective seventy-five-year sentence are affirmed.

_____
NORMA McGEE OGLE, JUDGE